*Purviance,* for the Appellant.

*Kell* and *S. Chase,* Jr. for the Appellee.

# GENERAL COURT, MAY TERM, 1805.

## THE CORPORATION OF THE ROMAN CATHOLIC CLERGYMEN's Lessee, *vs.* HAMMOND.

The act of 1715
ch. 47, cured no
defects in the
acknowledgments
of deeds made
under previous
laws, with regard
to *femes covert.*

EJECTMENT for a tract of land called *Agno,* lying in Anne Arundel county. Defence on warrant, and plots returned.

Before that act, as well as after, those acknowledgments were defective, unless the exact form mentioned in the acts of assembly on the subject, was complied with.

A certificate under the act of 1792. ch 55. entitled, *An act for securing certain estates and property for the support and use of the ministers of the Roman Catholic Religion,* by persons, stating that they were chosen, under the provisions of said act, as trustees to carry the same into effect, and that by virtue of such authority they assumed to themselves the corporate name and style of The Corporation of, &c. which was made by such trustees, and recorded as directed by said law, and which was accompanied with possession by them of the land in dispute, without objection by those who were interested, was held sufficient to authorise the jury to presume that such persons had been chosen in compliance with all the provisions of said law, though it did not appear by such certificate, or in any other way, that those provisions had been complied with.

A devise to A. and his heirs, for ever, but in case of his death before that of the devisor, or of his *(the devisee) not disposing of the property devised before his (the Devisee's) death,* then, with a remainder over to B. and his heirs, a disposition by A. by *last will,* is a disposition by him in his life-time, and as such defeats the estate in remainder.

The undisturbed possession of part of a tract of land, without title, is no evidence that the persons holding such possession claimed the whole tract.

*Quere.*—Whether the true construction of a will is to be made from the will itself, and not to be gathered from matter *de hors* the will, if it be doubtful as to what is the true construction?

MAY 1805.

Corporation, &c.
vs.
Hammond.

1. *The first bill of exceptions.* The plaintiff gave in evidence a *certificate* of survey of the tract of land called *Ayno*, for which this ejectment was brought, surveyed for *Henry Hanslap*, on the 30th of September 1682, for 400 acres, and a *patent* to him therefor, dated the 2d of August 1682; and that said land was truly located on the plots returned in this cause. He also gave in evidence the will of *Henry Hanslap*, dated in the year 1697, whereby he devised *Ayno* to his daughter *Susanna Hanslap*, and to her heirs and assigns; and also gave in evidence, that *Susanna Hanslap* survived the devisor, and became seised and possessed of *Ayno*, under and in virtue of the devise; and that being so seised, she intermarried with *Thomas Gassaway*; and he also read in evidence an entry taken from the *Rent Roll* for Anne-Arundel county, showing that this land had been surveyed on the 30th of September 1682, for *Henry Hanslap*, and that *Thomas Gassaway*, in right of his wife, the daughter of *Hanslap*, was in possession at the time the rent roll was made out, and that by the rent roll it appeared that there had been an alienation of the land on the 15th of September 1709, by *Thomas Gassaway* and *wife*, to *James Carroll*. He also gave in evidence the last will and testament of *James Carroll*, and a codicil thereto, the former dated the 12th of February 1728, and the latter dated the 17th of February 1728, by which will the land is devised to *Charles Carroll*, cousin and godson of the devisor, and his heirs; but by the codicil, (which recites the devise to *Charles* of a certain part of his estate, in trust and confidence that he *Charles* would invest therewith his good friend Mr. *George Thorold*, of, &c. it is stated, that through apprehension of *Charles's* death, he (the devisor,) did by the codicil, confirm and give unto the said *George*, what he expected and did not doubt *Charles* would give pursuant to his intention, if death or other accident did not interpose, and also confirmed his former will in all respects, except the clause whereby he devised to *Charles*, amongst others the land called *Ayno*, which he rescinded, annulled and made void, as to *Charles*, and

by the codicil he devised that land &c to the said *George* *Thorold*, his heirs and assigns, for ever; and in case of his death, before his (the testator's,) then he devised the same &c. unto his very good friend Mr. *Peter Attwood* of, &c. his heirs and assigns, for ever; and in case of both their deaths before the testator's, then he devised it unto Mr. *Joseph Greaton*, his heirs and assigns, for ever. The plaintiff also gave in evidence, that *James Carroll* died seised of the said land some time about the 27th of July 1729, and that *George Thorold*, the devisee in the codicil mentioned, entered and became seised thereof. And also gave in evidence the last will and testament of *George Thorold*, dated the 16th of June 1727, whereby he devised the said land unto *Richard Molyneux*, to him and his heirs, for ever; but in case of his death before the devisor's; or his not *having disposed of it before his death*, either in whole or in part, then the said devisor gave and bequeathed his said estate both real and personal, or the part remaining as above said undisposed of, to his well beloved friend *James Guin*, of Queen-Anne's county, to him and his heirs, for ever. The plaintiff also gave in evidence, that *George Thorold* died seised and possessed of the said land called *Ayno*, and that after his death, *Richard Molyneux*, the devisee in the said last mentioned will named, did enter into the land under and by virtue of the said will, and became seised thereof, and afterwards died, having first made and executed his last will and testament, dated the 28th of April 1749, which the plaintiff gave in evidence; whereby the said *Molyneux* gave and devised all his real and personal estate wheresoever, and of what denomination soever, to his well beloved friend *George Hunter*, of Charles county, or in case of his death before the said devisor, to his well beloved friend *Benedict Neale*, of Baltimore county, them, their heirs or assigns, for them and their use and behoof for ever. The plaintiff also gave in evidence, that after the death of *Richard Molyneux*, *George Hunter*, the devisee in the said last mentioned will, entered into the said land called *Ayno*, under and

by virtue of the will, and became thereof seised, and
being so seised, afterwards, to wit, the 22d of July
1778, duly made his last will and testament, and then
died, leaving the same in full force and unaltered, by
which will he devised the said land called *Ayno*, in fee
simple, to *James Walton*, who entered into the said
land under and by virtue of the said devise, and be-
came thereof seised.   The plaintiff also read in evi-
dence an act of assembly passed in 1792, *ch. 55*, (No-
vember,) authorising the Roman Catholic Clergy to
declare the uses for which certain estates had been
held by them, and to assume a name and style of cor-
poration.   The plaintiff also gave in evidence, that
the said *James Walton* being so seised, did afterwards
make and execute a deed or declaration, which, with
the several endorsements thereon made, was produced
and read in evidence, to wit: "I, *James Walton*, of the
county of Saint Mary's, and the state of Maryland,
do by virtue of these-presents make known, publish
and declare, in conformity and agreeably to an act of
assembly of the State of Maryland, entitled, "*An act
for securing certain estates and property for the support
and uses of the ministers of the Roman Catholic Religi-
on*," that the real property hereafter specified, viz.
*St. Inigoes Manor*, &c. &c. *Hainault*, commonly called
*Ayno*, lying in Anne-Arundel county, &c. and also all
other my lands and real estate whatsoever in the state
of Maryland, and all the mixed and personal property
annexed and appertaining to these several estates,
hath been and now is held by me the said *James Wal-
ton*, under a confidential or implied trust, for the use,
benefit and maintenance of the ministers of the Ro-
man Catholic Church, now exercising their ministe-
rial functions within the United States of America,
agreeably to the rule and discipline of their church,
and who were formerly members of the religious so-
ciety, heretofore known by the name of The Society
of Jesus.   In testimony whereof I have hereunto set
my hand and seal this 3d of October 1793.

James Walton, (L. S.)

Signed, sealed and delivered, in the presence of
*Henry Barnes, Henry H. Chapman*."

MAY. 1805

Corporation, &c.
vs
Hammond

*Acknowledged* the 3d of October 1793, by the said *James Walton,* as his act and deed, before the said *Henry Barnes* and *Henry H. Chapman,* being justices of the peace for Charles county. An oath annexed, taken by the said *Walton,* before the said justices, that the said estates were held by him for pious purposes acquired before the 14th of August 1776. *Recorded* in the general court land records the 15th of October 1793.

The plaintiff also read in evidence, a declaration, with the several endorsements thereon, which is as follows: "Whereas an act of the assembly of the state of Maryland was passed at the session begun in the month of November 1792, entitled, *An act for securing certain estates and property for the support and uses of the ministers of the Roman Catholic Religion:* And whereas it is therein enacted, that trustees be chosen for certain purposes expressed in the said act, WE, the undersigned, being so chosen, hereby declare, that we have assumed, and do assume the style, name and title, of *The Corporation of the Roman Catholic Clergymen,* by which we, and our successors, for the time being, are to be designated and known; and that we hereby certify the same under our hands and seals, at *St. Thomas'* Manor, Charles county, this 5th of October 1793.

> *James Walton,* (L. S.)
> *John Ashton,* (L. S.)
> *Leonard Neale,* (L. S.)
> *Robert Molyneux,* (L. S.)
> *Charles Sewell,* (L. S.)

Test.    *Henry Pile,*
         *John Bolton.*

*Recorded* in the *law* records of the State in the General Court Office the 15th of October 1793.

The plaintiff also gave in evidence, that the plaintiff, and those under whom he claims, have been at all times, since the 15th of September 1709, in the actual possession of the land called *Ayno,* claiming the same as their estate in fee simple under and by virtue of the said patent, and several wills and declara-

tions before set forth. The plaintiff also gave in evidence sundry depositions of witnesses, admitted to be read, proving that the said land had always been claimed and held by the plaintiff, and those under whom he claims, since the recollection of the witnesses.

The defendant produced and read in evidence to the jury, a deed for the said land called *Ayno*, from *Thomas Gassaway*, and *Susanna* his wife, to *James Carroll*, dated the 15th of September 1709, together with the endorsements on the said deed. The acknowledgment of which deed is in these words: "September 20, 1709. Then came before us, *Richard Jones*, junr. and *Thomas Larkin*, two of her majesty's justices for the county of Anne-Arundel, *Thomas Gassaway* within mentioned, and acknowledged this deed according to act of assembly; also *Susanna* his wife, daughter and legatee of the within mentioned *Hanslap*, who being examined according to law, declared that she consummates this deed without the compulsion or coercion of the said *Thomas* her husband. In testimony whereof we have hereunto set our hands the day and year above." And the defendant then prayed the opinion of the court, and their direction to the jury, that this deed was inoperative to pass the estate and interest of said *Susanna* in and to the said land, except during the life of her said husband.

*Harper*, for the plaintiff, contended, that the act of 1699, *ch.* 42, was not repealed by that of 1715, *ch.* 47, but was repealed by the act of 1715, *ch.* 49. That the deed under consideration was made in 1709, and must have been acknowledged under the act of 1699, *ch.* 42, *s.* 6. That the 7*th section* of the act of 1715, *ch.* 47, declares that all deeds made during the continuance of the act of 1699, *ch.* 42, if *enrolled* within 12 *months,* (the time limited y that act,) should be valid, notwithstanding other defects. This deed was enrolled within the time prescribed, and the defect of the acknowledgment has been aided by the act of 1715. In this case the defendant does not claim under any title adverse to the title of the plaintiff: In

MAY 1805.

Corporation, &c.
vs
Hammond

the case of *Pattison vs. Chew*(a), deeds similar to the present one, were objected to on account of the defect in the acknowledgments by the *feme covert*; the deeds were dated in 1706 and 1707, and the court said, "that there was nothing in the certificates of the acknowledgments of the deeds repugnant to the directions of the act of assembly directing the manner of acknowledging deeds at that period, and that the said deeds were sufficient in law to pass the estate of the *feme covert* in the said lands." The courts will favour a remedial act, and protect a title of a century which has never before been controverted as to the whole of this land.

The defendant, to prove his locations on the plots, of the land for which he took defence, gave in evidence the deposition of a witness, in which reference is made to an ancient *land commission*. He also offered to give in evidence a paper purporting to be the whole proceedings, appearing on record, under the said commission; to which the plaintiff objected, because two lines of the land located on the plots, were not conformable to the grant, or to the description in the said paper; because the lines in the said paper mentioned, were not located by the defendant, and because the plot and survey mentioned in the said paper to have been made and returned, were not produced.— *Held*, that the said paper was proper evidence to prove by *general reputation* the location of the land, and the ancient possession of the respective proprietors thereof.

(a) PATTISON's Lessee *vs.* CHEW General Court, October Term, 1790. This was an action of *ejectment* for *Town Land*, or *Evans's Purchase*, *Hunt's Mount*, and *Trent*, lying in Anne-Arundel county. Defence was taken on warrant, and plots were made.

1. The plaintiff, at the trial, offered in evidence, and read to the jury, the certificate and patent of the land called *Town Land*, or *Evans's Purchase*. The defendant located on the plots, two lines of the land called *Town Land* or *Evans's Purchase*, and took defence for all the land included in his location of a tract of land called *Ayres*, which lies to the south of one of the said lines; and to prove his said location of the said two lines, and also his location of the land called *Ayres*, or which he took defence, produced and read to the jury the deposition of *John Carr*, taken at the beginning of the location of the said two lines, and read by the consent of the plaintiff, viz "The deposition of *John Carr*, aged 75 years, being duly sworn, deposeth and saith, that about 30 years ago he, this deponent, *had a commission*, and this place we are now at, where formerly stood a cedar post, was proved by *George* and *William Simmons*, and sundry others, to be the beginning of *Kequotan's Choice*, and a corner tree of *Samuel Chew's* land that lays to the S. W of this place," &c. The defendant produced to the court, and offered to read in evidence to the jury, a paper, the same being the whole proceeding appearing on record relative to the said transaction, [viz the commission and return alluded to in *Carr's* deposition,] to which the plaintiff objected, because the said two lines so located as above mentioned on the plots, were not agreeable to the certificate or grant of the said land, or to the description in the said paper; and because the said lines and courses in the paper mentioned, were not located, or mentioned to be located by the defendant on the plots in this cause; and because the whole proceedings were not produced, including the plot and survey in the said paper mentioned to have been made and returned.

JOHNSON, Ch. J.(a), was of opinion, that the paper offered in evidence was proper evidence to prove, by general reputation, the location of the lands called *Ayres* and *Evans's Purchase* or *Town Land*, and the ancient possession of the respective proprietors of the same. The plaintiff excepted.

(a) *Goldsborough*, J. was absent, and *Chase* J. had been counsel in the cause.

*Martin* (Attorney General,) for the defendant. This deed was executed during the continuance of the act of 1704, *ch.* 24, which contains a *formula* similar to the one in the act of 1715, *ch.* 47, for the examination of *femes covert.* The deed was acknowledged and recorded under the act of 1704, and not under the act of 1699. The act of 1715 does not recite the act of 1704, nor cure the defects of deeds made during the continuance of that act; nor does the act of 1715 remedy any defective acknowledgments. The act repeals former acts, and in doing so the legislature always save acts done under former laws. It never was intended to interfere with *femes covert,* or to aid any defective deeds made by

May 1805.

Corporation, &c.
vs
Hammond

2. The defendant, to make title to the land for which he took defence, produced to the court two deeds from *Thomas Watkins,* and *Mary* his wife, who was entitled to the fee simple in the said land, to *Samuel Chew* junior, one dated the 28th of February 1706, and the other dated the 17th of March 1707, and acknowledged on the day of their respective dates, as follow: "Memorandum, the, &c. came the within *Thomas Watkins,* and *Mary* his wife, before me &c. one of her majesty's justices of the provincial court, and the said *Mary* having been first privately and secretly examined touching her consent to the alienation of the within granted land and premises, she then freely and afterwards, together with her husband the said *Thomas Watkins,* acknowledged the said within granted land and premises to be the right and estate of the within mentioned *Samuel Chew,* Junr his heirs and assigns, according to the purport and intent of the within indenture, and according to the act of assembly in that case made and provided for acknowledgment of conveyances." And the defendant offered to make title to the said land under and from the said *Samuel Chew.* But the plaintiff objected to the reading the said deeds to the jury for the purpose of making title to the land therein mentioned, and that the deeds and acknowledgments were defective, and not sufficient in law to pass the estate of the said *Mary Watkins.*

*Held,* that there was nothing in the certificates of the acknowledgments made by a *feme covert* granting certain deeds by a *feme covert* grantor, repugnant to the directions of the act of assembly then in force.

Johnson, Ch. J was of opinion, and so instructed the jury, that there was nothing in the certificates of the acknowledgments of the said deeds repugnant to the directions of the act of assembly directing the manner of acknowledging deeds at that period, and that the said deeds were sufficient in law to pass the estate of the said *Mary Watkins* in the said land. The plaintiff excepted.

*Martin,* (Attorney General,) and *Pinkney,* for the Plaintiff.

*Cooke* and *Duvall,* for the Defendant.

*Verdict* for the plaintiff, agreeably to his pretensions, for that part of *Hunt's Mount* described on the plots F, &c. also for *Town Land,* &c. from D, &c. and for the defendant, as to the residue, according to his pretensions.

N. B. As this case has not been before reported, it is here given at length, although the question which arose under the *second bill of exceptions,* was alone referred to.

them. If the act of 1715 intended to cure the de-fects in all acknowledgments of deeds, it would have been unnecessary to insert the 12th section, which says, that deeds which had been acknowledged before one justice of the provincial court, or before one or two of the council, if enrolled according to the directions of the former acts, should be good. There was no act in force previous to 1715, which enabled one justice of the provincial court to take the acknowledgment of a deed; nor was there any act which authorised a member of the council to do it. The act of 1715 en-acted a new method of conveyance different from any of the preceding laws, and other laws upon the sub-ject became thereby repealed. But lest any injury might result from a repeal of former laws, the act of 1715 embraces savings of all rights acquired under former acts, if the parties had conformed themselves to the manner pointed out by those laws. He cited the case of *Harwood vs. Balty*, in this court, at Octo-ber term 1795, which was *non prossed* by learned counsel, under the full conviction that the act of 1715 was only a confirmatory act.

CHASE, Ch. J. (a). This question has been fre-quently decided by this court. The certificate of the acknowledgment should be in the manner the law di-rects, and unless so done, the acknowledgment is de-fective, and the deed cannot operate so as to bar the female covert. In this case the acknowledgment is defective, and the deed cannot operate to pass the estate of the *feme covert* in the land, except during the life of her husband. The plaintiff excepted.

Where an act of assembly delegates a special authority to a corporate body to assemble and assume a style &c if they make a declaration that they had done so, and they had held and possessed lands under the style assumed by them, it is suffici-ent to induce the jury to presume that all the requi-sites of the act had been complied with.

2. The defendant prayed the opinion of the court, and their direction to the jury, that before the plain-tiff can recover in this action, it must be proved that the ministers of the Roman Catholic Religion within the state, being citizens thereof, exercising ministe-rial functions agreeably to the rules and discipline of their church, did convene and appoint, from their own body, persons who did assume the style, name and title, in the manner pointed out by the 3d section of the act of *November session* 1792, ch. 55.

(a) *Done* and *Sprigg*, J. concurred.

*Key*, for the defendant. The *3d section* of the act
*of Nov.* 1792, *ch.* 55, directs "that it shall and may be
lawful for the ministers of the Roman Catholic Reli-
gion within this state, citizens thereof, exercising
their ministerial functions agreeably to the rules and
discipline of their church, and in whose favour the
said declaration shall have been made," [*alluding to
the declaration in the 2d section to be executed by the
proprietors of property held in confidential trust, &c.*]
"to convene at a place to be by them agreed on, with-
in twelve months from the passing of this act, and
then and there adopt such regulations, for the ma-
nagement of their estates and temporalities, as shall
seem fit and advisable to a majority of the ministers
so convened; and the said ministers, or a majority of
them, so met, shall then and there choose, from their
own body, certain persons, not less than three nor more
than five, who shall assume the style, name and title, by
which they are to be designated and known, and shall
certify the same, under their hands and seals, within
three months thereafter, to the clerk of the general
court of the western shore, who is hereby authorised
and required to record the same in the records of the
laws of the state," &c. The declaration of the cler-
gy assuming the style, &c. does not state that the
persons pointed out by the act met and made choice
of the persons, who have by this declaration assumed
the style. These persons have said, that they had
been so chosen, but they do not say who had chosen
them, at what time, or at what place. This act cre-
ates a special authority, and it is a general rule, that
a special authority must be pursued precisely. In this
case then it must appear that the persons described in
the law gave notice of their intention to meet at a
certain place, on a certain day, for the purpose of
choosing the persons pointed out by the law; that they
met on the day and at the place, and made the choice
of persons answering the description, and those per-
sons must certify that they did assume the style, &c.
Instead of this they say, "*We, the undersigned, being
so chosen,*" &c. without stating that they had the au-

MAY 1805.

Corporation, &c.
vs.
Hammond.

thority prescribed by the act to make the declaration that they had assumed the style of incorporation. It is not sufficient for them to say they had been chosen —But it must appear how and in what manner they were chosen, and all legal requisites must appear to have been complied with under the act of assembly, as in land commissions. It has been repeatedly decided in this court, under the acts *for marking and bounding lands*, and for *perpetuating the bounds of land*. that unless it was shewn by the return of the commissioners how and in what manner the same had been executed, the return was insufficient, and that a certificate of the commissioners that they had given the notice directed by the law, without saying what notice, was fatal. Cites *Weems vs. Disney, (4 Harr. & M'Hen. 156.)*

*Shaaff,* for the plaintiff. The gentleman, who has just urged the objection to the court, was one of the members of the legislature at the time the law passed, and no doubt was friendly to the passage of the act. It was not his intention certainly that no benefit should result to the clergy by the law. But if this declaration is adjudged defective, the legislature have done little for the benefit of the Roman Catholic Clergymen. The act directs that they shall *"certify the same."* What was intended by the law to be certified? The style, no doubt, of incorporation. This has been done, they have certified the style, which is directed to be recorded amongst the laws of the state. The declaration says, *"being so chosen"*— meaning no doubt, in pursuance of the act. The act does not require that the proceedings should be recorded. It only directs that a declaration of the style, which may be assumed, shall be recorded. How is the act to be construed? It surely meant to hold out a benefit to the clergy, and should be construed beneficially, and the court will strive not to defeat the salutary provisions of the legislature. If it is objectionable now, it will be so fifty years hence; and how could it be proved at that distance of time who

met, since the act does not direct the proceedings to be recorded; and if the proceedings had been recorded, (the law not directing them to be recorded,) they would have received thereby no additional validity, and of course would not be proof of the meeting. Every thing is recorded which the act requires, and if more had been recorded than was directed, it would have availed nothing. It has been said, that it must be proved who met, and that they were in the exercise of their ministerial functions. It may be asked, how it could be proved, except by one of their own body, if alive, and, if dead, it could not be proved at all. The case of commissions to mark and bound lands is different. There the whole proceedings are directed to be returned and recorded. But by this act, only the result of the meeting is to be certified, and nothing preparatory is deemed by the law at all necessary. The court will not surely give a rigid construction to this law. If the court adopt the opinion of the counsel of the defendant, the corporation fail, and they cease to be a corporate body—they will be completely defeated, and the consequence must be very destructive to the clergy. By the law the ministers are directed to meet and make choice of persons to assume a style, who are to *"certify the same."* A certificate that they had assumed the style is *prima facie* evidence that the procedure was correct, and the *onus probandi* lies on the defendant, to prove that they did not meet and make choice, &c. as they were directed. It was intended that what the ministers should do was to become *a part of the law*—for the law was full and conclusive, except as to the corporate name, which the legislature did not choose to give, but left for the clergy; and a bare certificate of the name, to be of record, was all that was deemed necessary. This has been done, and it is confidently expected the court will consider it sufficient. There is no instance of the acts of a corporate body being questioned in this incidental manner. In actions for money had and received, brought by a corporate body, there is no in-

MAY 1805.

Corporation, &c.
vs
Hammond.

stance in the books where the corporation have been compelled to prove themselves a corporate body, by proving they had complied with the terms of the act of incorporation, to enable them to act in a corporate capacity. And it would not be possible for any of the chartered banks, companies or corporations, to show that they have complied in every particular with the laws granting their charters; and if the strictness is required which the counsel for the defendant contend for, there is not a corporation in the state. It would be impossible, for instance, to prove that no person voted but such as had a right to vote. In the case of *mandamus's* it must be shewn that notice was given.

*Harper*, on the same side. This is not an act required to be done under a special power, which is to be construed with the same strictness as in cases where other persons are to be affected by it. Where special powers are delegated, the courts have been strict, because the rights of the persons delegating the powers are to be affected. But here the rights of those conferring the power, were not to be affected, nor the interest of others as in land commissions. This is an act to give a name to a corporation, and the legislature leave it to the Roman Catholic Clergymen to choose a name. It is a mere power delegated for giving formality to an act for completing a power, and surely not one of those cases where all that rigid strictness ought to be observed. In the case of commissions to mark and bound lands, third persons may be affected. This is the reason why the law relating to them is to be strictly pursued. But in the present case no one can be injured by the style which the Roman Catholic Clergymen have adopted. In the returns to *mandamus's*, there are acts which may bind and preclude the rights of third persons, which is the reason that the utmost strictness is required to be pursued. But this is a mere formality, whereby no person is to be affected. This declaration declares that to be done, which the act has directed to be done, and it is immaterial how the persons who have certified, have been ap-

pointed. The act has been complied with, if it has not, the *onus probandi* is on the defendant.— Corporate elections or constitutions are not to be incidentally examined. In the case of the *Bank of Columbia vs. Ross,* (4 *Harr. and M·Hen.* 456,) the law creating the bank gave an authority to the president of the bank to issue executions against the person or property of any of the debtors to the bank, upon complying with 'certain requisites; and the president accordingly directed a *fieri facias* against *Ross.* At the return day of the writ, there was a motion to set aside the writ; and among other reasons one was, that it did not appear that General *Mason,* who had directed the *fieri facias,* was president of the bank; but the court said. they would consider General *Mason* as the president of the bank, he having stated himself so, and the contrary not appearing.

*Martin,* (Attorney General,) in reply. Unless there is legal evidence that the clergy have done that which the law requires to be done, it is not sufficient. How can it be said that other persons are not to be affected by this proceeding of the clergy, since the corporation are authorised to bring suits in their corporate name? The legislature did not ask a favour of the Roman Catholic Clergy. It was the Roman Catholic Clergy who solicited this law, and it was passed in compliance with their wishes, and there was no difficulty in their acting under it, so as to comply strictly with its provisions. It has been said that it was merely to give a name to the corporation. This was a very necessary requisite; for until a name, there was no life in the corporation. It was the first act of their existence. There can be no doubt but there ought to have been notice given before the clergy met, and that the purpose of their meeting should have been set forth in the notice. The proceedings ought to state who met, so as to show that the persons who acted had authority to meet under the law, and that persons of the description mentioned in the law, were chosen. It does not appear that the persons

who acted are of the description pointed out by the law. Every member of the Roman Catholic Clergy is interested; every member of the community may be interested. The corporation may sue or be sued by their corporate name and style. The words of the declaration are, *"we, the undersigned, being so chosen,"* &c. without setting forth who chose them, and without shewing that the persons who chose had given the notice, and were of the description of persons designated by the law. It has been said that there was no necessity to record the proceedings. It has always been deemed necessary to record a power of attorney to acknowledge a deed, and yet there is no law directing a power of attorney to be recorded. Though it may be necessary to prove the meeting at this time, it does not follow it must be proved fifty years hence—for it is only necessary to prove recent transactions—but in transactions of a long standing the law will presume them to have been correctly done. Feoffments of ancient dates need not be proved where possession has been held under them. It would have been proper to record the whole proceedings of the meeting, choice, &c. But taking it as unnecessary, there must be proof that there was a meeting in the manner the law directs. In the cases of commissions to mark and bound lands, it is not only necessary that the commissioners should state they gave the notice; but they must show what notice they did give—for the law says no man shall be the judge of what he himself does. So in the case of *Whetcroft vs. Dorsey, (4 Harr. & M·Hen. 357,)* it was decided in the court of appeals, that the authority under which this court acted must appear, it being under a private act of assembly, and could not be noticed unless stated in the record, so as to enable the superior court to determine whether the general court had pursued the special authority delegated to them by the law. So in the case of *Harper vs. Hampton(a),* this court decided, that a power given ought to have been strictly pursued by the attorney in executing the trust reposed in him. The corporation could not

(a) See 1 *Harr. & M·Hen.* 175. (Note.)

MAY 1805.

Corporation, &c.
vs
Hammond.

be seised of the estates until the name and style had been assumed. The whole life and soul of the corporation depended upon this act. Hence the importance of a proper procedure to effect the purpose. The five persons who have certified, may be methodists, quakers, or any other sect of christians, for any thing that legally appears. So that the Roman Catholic Clergy may be injured by this assumed act. They may never have met, or assumed the style here given. In cases of *mandamus's* for the purpose of turning out and admitting ministers, it has been judged necessary that the proper notice should be given. In that case who are affected by the notice? No one. The lessors of the plaintiff will be precisely in the situation they were previous to the passage of the law, if the court should be of opinion they have not pursued the mode pointed out to entitle them to become a corporate body; and upon their application, no doubt, the legislature would grant a similar law— and they would then take care to comply with the terms of it. The case of land commissions is of more serious consequence than this—for there the party is without redress. He is deprived of testimony which he had taken under the commission, and which it might not be afterwards in his power to obtain. If this is not the proper mode of contesting the right and title of the corporation, where, when or how, is the right to be called in question? The plaintiff claims under a demise from "*The Corporation of the Roman Catholic Clergymen,*" and the defendant is endeavouring to show there was no such corporation who could make the demise. In any action by a corporate body, they may be compelled to show they have done all those acts necessary to constitute them a corporate body. If a *general* power is to be executed, and the power is certified to be executed, it is *prima facie* evidence of its having been done; but it is different with a *special* power—there it must be specially certified, and nothing is to be presumed which does not appear.

*Key*, also in reply. The acts to be done under the law are conditions precedent to their existence as a body corporate, and unless these conditions were performed, they had no existence, and could not make the demise under which the plaintiff claims. By a subsequent section in the act of 1792, *ch.* 55, it is enacted, that when these acts are done then they are to be in the seisin and possession of the estates—these acts not being done, they have never been seised of the estates

CHASE, Ch. J. The court are of opinion, that the *declaration*, that the ministers of the Roman Catholic Religion have assumed the name, style and title, of *"The Corporation of the Roman Catholic Clergymen,"* agreeably to the law, if accompanied with evidence that the lessors of the plaintiff are, and ever since the recording the said declaration have been, in the sole use, occupation and control, of the land for which this action is brought, without objection from those interested, it is sufficient to induce the jury to presume, and they ought to presume, that the ministers had assembled and made choice of the persons who have assumed the said name, style and title, and that all previous requisites had been complied with according to the act of 1792, *ch.* 55.

There was no exception taken to this opinion.

3. *The second bill of exceptions.* The defendant then prayed the opinion of the court, and their direction to the jury, that the will of *Richard Molyneux* did not operate to pass a fee simple estate to *George Hunter*, the devisee in the said will named, so as to enable him to devise the same by will, but that on his death the fee simple estate in the land called *Agno*, in the declaration mentioned, did pass by virtue of *George Thorold's* will to *James Guin* and his heirs.

*Johnson*, for the defendant, objected to the will of *George Thorold* as not devising a fee simple to *Richard Molyneux*. From the expressions in the will, a fee simple is devised to *Molyneux*, with an execu-

G. T. by his will devised as follows: "I give all my estate, both real and personal, to R. M. to him and his heirs for ever; but *in case of his death before mine, or his not having disposed of it before his death either in whole or in part,* then I give and bequeath my said estate, both real and personal, or the part remaining as above undisposed of, to my well beloved friend J. G. to him and his heirs for ever." R. M. survived the testator, and *devised* the said estate to G. H. Held by the *general court,* that the devise by R. M. was not such a *disposition* of the estate so as to defeat the limitation over to J. G. But, on appeal, *reversed* by the *court of appeals.*

tory devise to *James Guin*. The words of the will are—"I give all my estate, both real and personal, &c. to *Richard Molyneux* of Charles county, to him and his heirs for ever; *but in case of his death before mine, or his not having disposed of it before his death either in whole or in part,* then I give and bequeath my said estate, both real and personal, or the part remaining as above undisposed of, to my well beloved friend *James Guin*, of, &c. to him and his heirs for ever." *Richard Molyneux* having, by will, devised the estate, it is not such a compliance with the will as the testator contemplated. The estate therefore became vested in *James Guin*, and could not pass under the devise in the will of *Richard Molyneux*. Where a future interest without a preceding estate, or a contingent interest unsupported by any preceding freehold, or any estate after a preceding vested fee simple, is limited by a devise, such limitation, as it cannot be good as a remainder, may take effect as an *executory devise*. 2 *Fearn. Cont. Rem.* 17. An executory devise is good if it takes effect. In the case of joint tenants, upon the death of one, the estate survives, and the right by survivorship overreaches any disposition by the other joint tenant. Executory devises are not to be defeated by any alteration whatever in the estate *out* of which, or *after* which it is limited. A secret trust is not countenanced by our laws, and if this was a secret trust, it was illegal and cannot be resorted to in order to aid the will. The case is to be considered as if the question had occurred on the will of any other person. If *Molyneux* did not by deed dispose of the estate, the moment he died it vested in *Guin*. It is precisely like the case of joint tenants—upon the death of one, the estate goes over to the survivor. Could *Molyneux* by *will* defeat the disposition by *Thorold*, who had limited the estate to *Guin*, if he (*Molyneux*) did not *in his life-time dispose of it?* The object of the defendant is to show that the title is not in the plaintiff.

MAY 1805

Corporation, &c.
vs
Hammond

*Harper*, contra. The question, is, whether or not the events did happen which are stated in the will, and not whether it was an executory devise? The intention, as evidenced in the wills produced in this cause, go to show that the estate was held under secret trusts for pious uses, and it is evident that the present will was intended to transmit the estate down, so that it might be devised to such person in whom the testator had a confidence to hold it for those pious uses. In wills the intent of the testator, and the circumstances in which he stood, are to govern, and his will is to be construed with reference to his intent. The devise in this case should be construed "in case of *Molyneux's dying without will*, or omits to make a disposition, &c. then to *Guin*," &c. There were two events contemplated by the will. 1. If *Richard Molyneux* should die in the life-time of the testator. 2. If he should not make a disposition of the estate. A devise by will is a disposition of the estate to take effect at his death—the same as if he had in his life-time made a deed to take effect after his death. A voluntary gift by deed is subject to the same control of the donee, as a will is. If a man gives his estate by will, the general parlance is he has *disposed* of it. The case of joint tenants is not applicable to the present case. There the whole interest terminates with the death of the first tenant, unless measures had been taken to prevent it by a severance of the joint tenancy. Suppose the phrase was, "*or dying without making a disposition by will*," would there be any doubt? Surely not. The words used are intended in this case to have the same effect—and the intent should be enforced. A disposition made by will is one made in the life-time of the party. Suppose a man by deed makes a settlement to his own use during his life, inserting a clause of revocation if he should judge proper—this would be nothing more than a will. It is the disposition of an estate, to take effect at his death, with a power of revocation by will. It would be considered, if he did not revoke it, to be a disposition in his life-time. If there ever was a case where

the court would be *astuti*, this is one, where the de-
fendant sets up rights out of himself, to defeat the
plaintiff's recovery.

*Shaaff*, on the same side. We admit that the de-
vise in question would be an executory devise if the
events had happened. But the true question is,
whether a will of *Molyneux* is a compliance with the
expressions used by his testator. What did the tes-
tator mean? For his meaning is to prevail. It appears
that the estate had been held in confidential trust.
What was the object of *Thorold's* will? That *Moly-
neux* might hold the estate as long as he lived, and
after his death that some person, in whom *Molyneux*
might have confidence, should hold it under the same
trust. What is a will? Is it not a disposition of a
man's estate? And if a man gives his estate to A. is it
not said he has disposed of his estate? When is the
estate disposed of? Surely in the life of the party,
though to take effect after his death. It is a common
phrase to say a man *disposed* of his estate *by will.*
Covenant to stand seised to uses to take effect in fu-
turo. *Wilson's Rep.* If a man enters into a covenant
to stand seised to uses to take effect after his death,
it is considered a disposition in his life-time. A will,
which can only take effect after his death, is equally
a disposition of his estate in his life-time. The mani-
fest meaning of the testator is, that *Molyneux* should
continue possessed, during his life, and that the estate
was not to go to *Guin* if *Molyneux* did make his
will, so as to dispose of it.

*Key*, in reply. Much has been said as to secret
trusts; yet there is nothing in the will upon the sub-
ject either expressed, or which can be implied. It
cannot be collected from the will that the testator
meant that *Molyneux* might dispose of the estate by
will. It was not necessary to say, "unless he dispo-
sed of it *in his life-time*," if the intention was that he
might dispose of it by will. If it was for the benefit
of trusts it would not be left to the last moments of

*Molyneux* to carry into effect that secret trust: It was a matter of too much consequence to be delayed. The words are, that he should "*dispose of it in his life-time.*" It was never said, that a person had disposed of his estate *in his life-time* where he had devised it by will. A will is nothing during the life of the testator. It is subject to his control, and he can revoke it when he pleases. But a deed of lands to take effect after the death of the grantor is different, and if recorded, cannot be revoked by the grantor. The interest was complete in *Guin* if *Molyneux* did not in his life dispose of the estate by deed. A joint tenant may sever the estate; but if he neglects to do so, it goes over upon his death to the survivor; so in this case, *Molyneux* having neglected to convey, the estate is complete in *Guin.*

*Martin,* (Attorney-General,) also in reply. It is immaterial whether there was or was not a secret trust, because no circumstances, but the will itself, is to be taken into view in the construction of it. If it was a secret trust, the devisor could not tell to whom *Molyneux* might devise. The testator knew *Guin,* and knew he was a person in whom confidence might be placed. But the court cannot take notice of secret trusts. These kind of trusts were considered by our laws as impolitic, and therefore not to be countenanced. Wills cannot be construed upon events which might afterwards happen. If the meaning of the testator was, that if *Molyneux* died without disposing of the estate by *will,* how easy was it to have said so. But it was supposed that *Molyneux* might in health make a good disposition by deed, which he might not do in old age, or in sickness, upon his death-bed. A covenant to stand seised to uses, to take effect after the death of the covenantor, is an actual conveyance of the estate, and is unchangeable. An essential to a deed is that it should be delivered over. But a will is subject to be changed by the testator. We admit that a power may be given to dispose of an estate by will. But we con-

tend that if the disposition is to be made *in the life* of the party, it cannot be done by *will*. It does not appear by the will of *Richard Molyneux* that this land is mentioned at all—nor is there any thing in his will to shew that he believed he had right to devise it. It is a general rule in the construction of wills, that all words which will bear a construction, shall have one. But the gentlemen would have the words *"in his lifetime,"* omitted, and this will to be construed as if no such words were in the will. This case has been assimilated to the case of a deed subject to revocation. A deed subject to revocation is a complete deed, and no judgments afterwards rendered against the grantor would bind the lands conveyed by such deed. But it is well known, that lands devised by will are subject to judgments rendered against the devisor.

Chase, Ch. J. *(a)*. The question is, whether the will of *Richard Molyneux* is such a disposition as to defeat the executory interest of *James Guin*, the remainder-man over. The court are of opinion, that the will of *Richard Molyneux* is not such a disposition of the estate so as to defeat the devise over to *James Guin*, the remainder-man, and that it did not pass a fee simple estate to *George Hunter*, so as to enable him to devise the same by will, but that on the death of *Richard Molyneux* the fee simple did pass by virtue of *Thorold's* will to *James Guin*, and his heirs. The will of *Richard Molyneux* was at all times during his life subject to revocation, and the court think the estate was not disposed of before his death.

Done, J. did not concur in the opinion of the court. He was of opinion, that the devise in the will of *Richard Molyneux* was a disposition of the estate.

The plaintiff excepted to the court's opinion.

4. *The third bill of exceptions.* The plaintiff then to support the issue on his part, gave in evidence to the jury, the patent to *Henry Hanslap*; the will of *Henry Hanslap* devising to his daughter *Susanna*; and

*Held*, that certain matters offered in evidence, were not proper or competent evidence, to prove possession of land.

*(a) Sprigg*, J. concurred.

the deed from *Gassaway*, and *Susanna* his wife, to *James Carroll*; and that the said *Carroll* entered and became seised, and being seised devised to *Thorold*; the will and codicil of *Carroll*; the will of *Thorold*; the will of *Molyneux*; the will of *Hunter*; the act of assembly, &c. and the declaration by *James Walton*. And also gave in evidence, that *Thorold, Molyneux, Hunter, Walton* and *James Guin*, were severally, in their lifetimes, priests and ministers of the Roman Catholic Religion. *And to prove that the said Carroll, Thorold, Molyneux, Hunter, Walton, and the lessors of the plaintiff, have at all times, from the 15th of September 1709, been in the actual possession and occupation of the said land called* Ayno, *under the patent thereof, and under the said deed, several wills and declarations mentioned, claiming the same as their estate,* gave in evidence an extract from the rent roll of Anne-Arundel, showing that the said land was surveyed for *Henry Hanslap* the 30th September 1682, and possessed by *Thomas Gassaway* in right of his wife, the daughter of *Hanslap,* who alienated to *James Carroll* on the 15th September 1709. And also gave in evidence the plots and explanations in this cause, and the depositions taken on the survey, and the plots and explanations, and depositions taken and filed in an ejectment formerly depending in this court, in which the present defendant's lessor was plaintiff, and a certain *John Ashton,* priest, was defendant; and also, that for more than forty years last passed, the priests of the Roman Catholic Religion, and after them the lessors of the plaintiff, have held, possessed and occupied, the said land called *Ayno,* by themselves and their agents, cultivating part, and claiming the whole as their estate in fee simple, and that there is no recollection or tradition of the said land, or any part of it, having ever been held or claimed as such by any person or persons other than the priests and their agents, and the lessors of the plaintiff and their agents.

But the defendant, by his counsel, objected to the said testimony for the said last mentioned purpose.

CHASE, Ch. J. *(a)*. The court are of opinion, and so direct the jury, that the matters offered in evidence, for the purpose of proving that *Carroll, Thorold, Molyneux, Hunter* and *Walton*, were in possession as aforesaid, are not proper or competent evidence to prove that *George Hunter* was in possession of the land, or any part thereof, claiming the whole. The plaintiff excepted.

5. *The fourth bill of exceptions.* The plaintiff, for the purpose of proving that the land for which the ejectment was brought, and other large estates, had at all times been held, claimed and occupied, by the said *Thorold. Molyneux, Hunter* and *Walton*, being priests and ministers of the Roman Catholic Religion, so far as they had or supposed themselves respectively to have had any right, title or interest, in and to the same, on a secret and confidential trust for the use, support and maintenance, of the ministers of the Roman Catholic Religion in this state, and that the object and intention of the said *Thorold* in making his will; was to provide a trustee for holding the said lands and estates in case the said *Molyneux* should either die in the life-time of the said *Thorold*, or in case of surviving him should omit to devise or convey the said lands and estate to some proper person, who might hold the same as trustee, and transmit it in like manner, offered in evidence all the matters stated in the next preceding bill of exceptions; and also offered in evidence, for the purpose aforesaid, that for many years last passed, the rents and profits of the lands mentioned in the declaration of the said *James Walton*, had been applied by the persons respectively holding the same, to the use and support of the ministers of the Roman Catholic Church in this state. But the defendant objected to the said evidence for the purpose aforesaid.

CHASE, Ch. J. The court are unanimous in their opinion, that they cannot take notice of any secret trust, and in the construction which they have given

*(a) Sprigg,* J. concurred.

*May* 1805.

Corporation, &c. v. Hammond.

*Quere.* Can the court take notice of any secret trust, or take into view any extraneous matter in the construction of a will?

MAY 1805.

Corporation, &c.
vs
Hammond

to the will of *Richard Molyneux*, they did not take into view any extraneous matter. They think that the true construction of the will must depend alone upon the will itself. The court therefore refuse to receive the said facts and circumstances for the purpose for which they are offered, being of opinion that the said facts and circumstances can have no influence in deciding on the true construction of the said will. The plaintiff excepted.

*Shaaff* stated, that by the decision which the court had given on the construction of the will of *George Thorold*, an estate of upwards of £30,000 was thrown into jeopardy. That the point had been raised by the opposite counsel very unexpectedly, and that the counsel for the plaintiff had had no opportunity of examining it. That he had just met with an authority which, with the permission of the court, he would read to them. It was *Powell on Powers*, 55 to 57, where it is said, that where T. being seised in fee, devised to M. his wife all the rest of his freehold lands and tenements in York for life, and *"then"* to be at her disposal, provided that she disposed of the same *"after her death,"* to any of her children. After the testator's death, the wife, having issue a son and daughter, married again, and she and her husband by lease and release, conveyed the lands to the use of herself for life, after her death to her daughter in tail, and for want of such issue, to her son, and his heirs, with a power of revocation. And one question on the execution of this power was, whether it were good being by way of *lease and release?* It was contended against the execution of the power, that this disposition by M. should have been *"by will"* and not by deed; the devise being to her for life, and *"then"* to be at her disposal. Three judges were of opinion that the power was well executed; which judgment was unanimously affirmed by the court of King's Bench. That this conveyance was an *"effectual,"* though *improper* execution of the power—cited *Com.* 194. *Salk.* 239. 1 *Wils.*

May 1805
Corporation, &c
vs
Hammond.

149. In *Powell on Powers* 57, a devise to a wife for life, and *"after her decease,"* she to give them *"to whom"* she would. The wife granted the reversion to a stranger. It was adjudged she might *grant away* the reversion *in her life-time.* He also cited 3 *Leon.* 71. *Ambler*, 64. Father had a power to make provision for the children by deed. He made it by will for children before provided for, and it was held good. He cited 2 *P. Wms.* 469. 1 *Cha. Cas.* 284.

THE COURT, however, continued of the same opinion.

Verdict and judgment for the defendant. The plaintiff appealed to the Court of Appeals. The appeal, by agreement of the parties, was put to issue, and came on for argument at the first term, in June 1805, on the *second bill of exceptions.* The other bills of exceptions are stated to have been withdrawn by the counsel of the parties.

*Shaaff,* for the appellant, on the *second bill of exceptions.* The only facts material on this exception are—that *James Carroll,* being possessed of the land in dispute, devised it to *George Thorold* in fee; that *Thorold* entered and devised to *Richard Molyneux* in these words: "I bequeath all my estate, both real and "personal, that is to say, &c. to *Richard Molyneux,* "to him and *his heirs* for ever; *but in case of his death, "before mine, or his not having disposed of it before his "death, either in whole or in part,"* then there is a devise over to *James Guin* and his heirs. *Molyneux* made his will, devising all his real and personal estate to *George Hunter,* and in case of his death in the lifetime of the testator, then to *Neale,* to them and their heirs, &c. It does *not* appear that *Molyneux* had any other estate to devise to *Hunter* except what he derived under *Thorold's* will. The general court determined that the will of *Molyneux* did not pass a fee to *Hunter,* so as to enable him to devise it, but that on the death of *Molyneux* the estate in the land for which the ejectment was brought, passed over to *James Guin.*

In the examination of this subject it is necessary to consider two general questions:

1. Whether *Molyneux* had, under *Thorold's* will, any authority to *devise* the estate?

2. Whether, supposing *Molyneux* to have that authority, he has in fact made such a will as will pass the estate?

*First question.* Had *Molyneux,* under *Thorold's* will, any authority to devise the estate?

In the consideration of this question it is material to examine into the nature of the estate devised to *Molyneux* by *Thorold's* will. He can only be considered as taking either an estate for life, with a power to dispose of the inheritance before his death, and in default of such a disposition, a devise over to *Guin;* or he took an estate in fee, the estate of inheritance, subject to be divested upon his not disposing of it before his death. Under the will, he was a tenant of the fee; but if he took either estate, he had equally the power to dispose of it by last will.

Let us first consider him as acting under a power of appointment. If the parties, in the creation of a power, have not particularly described the instrument by which the power is to be executed, the courts will go far to support the execution of it, by whatsoever instrument it may be intended to have been executed; and the doctrine "that powers are *strictly* to be pursued," has long since been exploded. On the construction of powers, and their manner of execution, courts of law have of late proceeded with the same liberality as courts of equity. 3 *Burr.* 1446. The British authorities go expressly to prove, "that if provision is not expressly made as to the nature of the instrument by which the power is to be executed, it may be done either by deed or will at the election of the donee." *Powell on Powers, 55.* In *Cro. Car.* 376, *Tylle vs. Peirce,* an action of debt was brought on a bond, conditioned to be void if there was paid to the obligee £300 to and for such uses as *A. S.* by *writing* under *her hand and seal, subscribed* and *published* in presence of two witnesses, should appoint:

It was held, that a *will*, under his hand and seal, and published, &c. was a good appointment. If a man has power by writing under his hand and seal, and testified by two witnesses, to make an estate to his children, it will be well executed by *a will* devising a rent charge, executed before two witnesses, &c. 3 *Cha. Ca.* 69, *Bath and Montague's Case.* In *Kibbet vs. Lee,* (*Hob.* 312.) *George Lee* covenanted to stand seised to certain uses, provided that he should at any time *during his life* be minded, upon any occasion, to make void or change the said uses, that *then* it should be lawful for him, &c. by *writing* under his *hand* and *seal,* and by him *delivered* in presence of three witnesses, to declare that his pleasure was that the said uses, or any of them, should be altered or made void, and that *then* and from *thenceforth* the said uses should be void, and the said *George Lee,* and all others, should stand seised to such uses as by *such* writing should be *limited.* *George Lee* by *will, signed, sealed* and *published,* in presence of three witnesses, devised the estates. It was held a good revocation and limitation over. See also 1 *Vent.* 280. In the case in *Cowp.* 260 *to* 265, the power reserved was "to the use of such persons, &c. as the said W. by any deed or deeds should limit," &c. Here there is no doubt it must be by deed, for it is expressly said to be by deed, and a will has never been considered a deed. This case is cited to show the opinion of *Lord Mansfield,* continued on to page 268, where there is a case cited, where the power was to be executed by "*any writing*" under hand and seal, &c. or any other deed. A will was made, and considered a due execution of the power, from the words "*any writing.*"

A feoffment, with power of revocation by *writing sealed* and *delivered* in the presence of three witnesses. *A will* devising these lands, *sealed* and *published* in the presence of three witnesses, was held a good execution. *Pow. on Powers,* 61. A man has power, by any writing subscribed and sealed by him in presence of three witnesses, in *express words,* to revoke, &c. He makes *a will* and *devises* the land—

MAY 1805.

Corporation, &c.
vs
Hammond

Held a revocation. *Sir Tho. Raym.* 295. Though the style of directing the mode of executing a power be by words which, in their ordinary import, must be understood to mean a deed; yet the execution will be good, although it be by will. *Powell on Pow.* 57. In *Com. Rep.* 194. *Salk.* 239. 1 *Wils.* 149. *Powell on Powers,* 55. The converse of the doctrine of the aforegoing cases is equally well established, viz. Where the power seems at first view as *if* intended to be executed by *will,* yet if the express contrary does not appear, it may be well executed by *deed.* These adjudications clearly prove, that a power reserved by expressions similar to the present, is well executed by *will*—all the authorities go to prove it; but the case of *Kibbet vs. Lee, Hob.* 312, is so fully in point as to leave no room for doubt. There the party had power to do an act in his *life-time,* under hand and seal, and delivered, &c. which is the legal description of a deed; yet this power was well executed by *will.* Here the party has power to dispose *before. his death,* which is the same as if it had been said in his *life-time* It is therefore contended, that if *Molyneux* took an estate for life, with a power only to dispose of the estate before his death, he might well execute that power by last will.

We will next consider *Molyneux* as taking a fee under the will of *Thorold,* the estate of inheritance, subject to be divested by his not disposing of it before his death. Nor is this an unusual estate in the law. *Powel on Dev.* 251. *Thorold* by his will, devises the estate to *Molyneux* and *his heirs;* but if the devisee died in the life of the testator, (which did not happen,) or did not dispose of the estate before his death, then it was devised over to *Guin.* This devise conveys to *Molyneux* a fee, which may be divested on the happening of a contingency, viz. his not disposing of it in his life-time. This fee will carry with it the incidental powers of such an estate, and with others, the *power* of *disposing* of it by *deed* or by *will.* The testator does not give to *Molyneux* any express power to dispose, but only provides for the event of his not exercising

a power which the general nature of his estate gave him. In this view of the subject *Molyneux*, in disposing of the property, only exercised one of the powers inseparable from the estate devised to him; he did not act in execution of any power, (legally speaking,) but as the owner of the land; the nature of his estate gave him the power to convey by deed, or dispose of it by will, and these instruments will take effect, according to their legal operation, out of the estate of *Molyneux* as the proprietor of that estate. If *Molyneux* had executed a deed, it must be admitted that it would have conveyed the land; and it will also be admitted, that the deed in such case would have operated out of the grantor's estate, and not in execution of any power. If he is not controled, he has equal power to dispose of the estate by last will; and it is presumed the will also takes effect out of his estate, and not in execution of a power. Let us next look into the will to see if the testator has prevented the devisee from disposing of the estate by last will. In the first place it is to be remarked, that there are no express words to prevent the devisee from disposing by will, and the nature of his estate will give him the power. The *general intent* of the testator is too plain to be mistaken; his object was to let *Molyneux* remain the legal owner of the fee during his life; but inasmuch as the heirs of *Molyneux* were unknown to the testator, and they might be such as he was not willing to place the same confidence in which he had reposed in his own devisee, the will provides for the case of intestacy, by directing that the estate shall pass over if no disposition is made of it by the devisee. The wish and the intent of the testator was to provide some person, in whom the devisee could confide, to succeed him in the estate, and it was perfectly immaterial whether this was done by *deed* or by *will*. The particular circumstances which in fact are connected with this title, show the intention of the testator to have been in reality that which we contend his words themselves convey The land in question was originally given by *James Carroll* for the benefit of

the Roman Catholic Clergy, and it has been so held ever since; the devisees have all been priests. *Thorold* devised to *Molyneux*, in trust, for the same purpose; a fee was created to secure the title; but, as the heirs of *Molyneux* might not be clergymen, a confidence is reposed in him to make a disposition to some proper person, whom he might know, and might think worthy of trust. The general intent of the testator is, surely, as contended for, and courts have gone so far as to give effect to this general intent, even if some secondary intent is defeated, and some words wholly disregarded. 8 *T. R.* 9. But we are not here driven to search for the intent of the testator, and to gratify it at the expense of any of his expressions; the literal meaning of the words of the will warrant the construction we contend for. The words of the will are—"but in "case of his death before mine, or his *not having dis-* "*posed* of it *before* his *death*"—then a devise over. I am at a loss to conjecture how this can be considered as excluding a disposition by last will. In common parlance, a man is said to *dispose* of his estate by *last will.* Our elementary writers speak of a *last will* as a method of *disposing* of property, and of the *devise* contained in the will as a *disposition* of the estate. 2 *Bla. Com.* 373-4. This must necessarily be a disposition *before the testator's death*, although the devisee takes no beneficiary interest until *after.* The disposition of property, and the time when that disposition will give the enjoyment of the estate, are things totally different. A man may dispose of his estate *in futuro*; every last will makes a disposition, and yet the disposition of the estate is *before* the death of the party. It is difficult to produce authorities to a point which depends on the words of a will, seemingly so plain in themselves; however, it appears that all the authorities before cited, to prove that the will of *Molyneux* would have been a good execution of a power, considering him as acting under a power of appointment, also strongly bear on this part of the case. It seems perfectly clear, that, if a *last will* is a good mode of executing a power reserved to a par-

ty "to dispose of an estate before his death," in like manner a *last will* may also be such a *disposing* of an estate, *before the party's death,* as will prevent the estate from passing over, when by the words of the conveyance it is *not* to pass over unless the party *does not dispose of it before his death.* In the case of the power, a *will* is determined to be a *disposal before* the party's *death;* so we contend here, that the *will* of *Molyneux* is a *disposal* of the estate *before* his *death.* The case before cited of *Kibbet vs. Lee. Hob.* 312, is particularly full to this point; the party there had power, *in his life-time,* to revoke the old uses and limit new ones, by writing under hand and seal, and delivered. It was there held, that a will was a proper mode to execute this power, although it was to be done in *his life-time.* Then to do a thing in a man's *life-time,* and to do so *before his death,* (the words of *Thorold's* will,) are surely synonimous terms. It is said in 6 *Com. Dig.* tit. *Poiar.* (C. 5)—If a woman has power to *dispose* by writing under hand and seal, &c. a writing in nature of a will signed and sealed, &c. will be good. *Powell on Powers,* 57. Hence it is contended, that *Molyneux* took a fee under the will of *Thorold;* that he had power to devise such estate, and that his will operated out of the estate devised to him, and not in execution of a power. But that if it should be thought that *Molyneux* had barely a *power* to dispose of the estate, yet it is contended that a last will is a good method of executing that *power.* This leads to the

*Second question.* Whether *Molyneux* has in fact devised the estate by his will?

This will has only general expressions devising all the estate to *Hunter.* There is no devise of the land by name. If I am right that *Molyneux* took a fee under *Thorold's* will, subject to be divested upon his not disposing of it, and that his last will is a disposition within the words, and that his will operates on his estate, and not in execution of a power, it will follow that the will of *Molyneux* does pass the estate in question to his devisee; because there are ample

MAY 1805.

Corporation, &c
vs
Hammond

words to pass the inheritance, if the devisor had in him the inheritance to devise—This is clear.

It only remains to be considered, whether a will, with these general expressions alone, will operate to pass the land, supposing that *Molyneux* only had a *power* to dispose of the property, and that his will can only have operation in execution of a power. The objection is, that it does not appear that *Molyneux* by his will intended to pass this land; inasmuch as he has not named it, but could have designed to devise only what he had an estate in. Here again we must resort to the intent of the testator. On examination, we will find that *Molyneux* devises the estate to *Hunter* under the same description by which he received it from *Thorold*, viz. by the words *"all his estate,"* &c. It is therefore fair to infer that he meant to pass to his devisee all the land and property he had received from his testator. But it is particularly to be remarked, that it does *not* appear in the bill of exceptions, that *Molyneux* had *any other real estate* for his will to operate on, except what he derived under *Thorold's* will. It is, to be sure, not stated in the exception *negatively* that he had *no other* estate; nor was it necessary, because the opposite party should have shown *any other* estate for the will of *Molyneux* to pass, if any such existed; but this is not done—nor is it a fact, that there was any such other estate. It will therefore follow, that if *Molyneux* did not mean to pass the estate in question under the description of his *real estate*, he meant to pass *nothing* by his will under that description. It is true, that a person acting under a power to dispose of an estate, must in some way evidence his intention to dispose of that estate. Here the execution of the power is by will, in which the intention is to govern; and if it should appear that the testator meant to devise the estate subject to the power, his intention is to be gratified in whatever words it may be expressed. How can any man doubt in this case that the testator meant to pass the land in question? When by supposing the contrary, nothing will pass by his will—An absur-

dity not to be attributed to any testator. In 6 *Com. Dig.* tit. *Poier*, (C. 4.) and *Powell on Powers*, 111—If a man executes a power by deed, without noticing the power, it will be good, if the deed will have no operation except in execution of the power. And in *Powell on Powers*, 119, it is said, it is not necessary to refer particularly to the estate subjected to the power, if it be sufficiently described by general expressions. A man has power to charge an estate with £2000, and a term is raised for that purpose. He executes the power by his will, in these words: "I charge all my real estate"—Held a good execution of the power. *Robert vs. Morgan and Clifford*, 1 *Atk.* 441. These authorities seem to establish all we contend for, viz. That the general description in *Molyneux's* will is sufficient to pass the land. Indeed, the words in 1 *Atk.* 441, are the very expressions of this will. It may be urged, that there is another decision which is adverse to our present doctrine—I mean the case of *Moulton vs. Hutchison*, 1 *Atk.* 559. That case, as decided, was simply this: *C.* had an estate for life, with power to appoint to certain uses, and in default of appointment, the estate was settled on *J. C.* A will was made by *C.* in which he devises "*all the rest and residue of his estate*" to *G.* without taking notice of the estate subject to the power. *C.* had *other real estates* to be affected by the devise of *the residue*. The chancellor determined that the power was *not* well executed. On examination of this authority, it will be found that the chancellor laid great stress upon the circumstance of the testator's having other lands for his will to operate on, and seems to admit, that if the testator had had no other land, the land subject to the power would have passed by these general expressions. So far therefore from this being an authority against us, it is strongly in favour of our principles; because in this instance, if the will of *Molyneux* does not operate on the land subject to the power, it can pass no real estate, nor have any kind of operation. It is therefore contended, that the will of *Molyneux*, will pass the land to *Hunter*:—

1. Because he had a fee under *Thorold's* will, and his own will passes the inheritance operating out of his own estate.

2. Because, if *Molyneux* had only a power of appointment, his will sufficiently describes the estate so as to pass it to his devisee.

*Pinkney,* on the same side. In the *fourth bill of exceptions* there is evidence of a variety of facts, calculated to show, that *Thorold* held the land in question *under a secret trust and confidence,* which lead us to the true construction of his will as to what he meant by the words *"not having disposed of it."* These facts were,

1. That this property has passed, through a long series of years, by a regular succession of devises, from *Carroll* to *Thorold*—from *Thorold* to *Molyneux*—from *Molyneux* to *Hunter*—from *Hunter* to *Walton,* who, in 1798 made a declaration according to the act of 1792, *ch.* 55, that this land had been, and then was held by him under a confidential or implied trust, for the use, benefit and maintenance, of the Roman Catholic Church in the United States.

2. That the said *Carroll,* and his devisees, (as well he who took as they who did not;) *Thorold* and both his devisees; *Molyneux* and both his devisees; *Hunter* and his devisees—In short, all the conduits of this title, until it became vested by the declaration of the last of them in the lessors of the plaintiff, were Roman Catholic Clergymen.

3. That for more than forty years past the priests of the Roman Catholic Religion, and after them the lessors of the plaintiff, have held, possessed, and occupied the said land, by themselves and their agents, cultivating part, and claiming the whole, and that there is no recollection or tradition of the said land, or any part thereof, having ever been held or claimed as such by any person other than the said priests, and their agents, and the lessors of the plaintiff, and their agents.

4. That the rents and profits for many years past have been applied to the use and support of the ministers of the Roman Catholic Religion.—And

5. The wills of *James Carroll, George Thorold, Richard Molyneux,* and *George Hunter.*

The land was originally conveyed to *James Carroll,* a Roman Catholic Clergyman. He devised it in 1728 to *George Thorold* and his heirs; and his will shows his care and caution to provide a trustee. So also does the will of *George Thorold,* who in 1737 devised the land to *Richard Molyneux* and his heirs; the will of *Richard Molyneux,* who in 1749 devised the land to *George Hunter* and his heirs; and the will of *George Hunter,* who in 1778 devised the land to *James Walton* and his heirs; all show the same. The fact, that *Thorold* held in trust, is in point of law entitled to influence the construction of his devise; and the general court's doubtful principle is an erroneous one in the latitude they give it. A doubt arises on the terms of the devise in the will of *George Thorold,* whether *Molyneux* was excluded by it from *disposing of the land by will.* The words are *general*—He devised the land to his friend *Richard Molyneux,* and his heirs, for ever; "but in case of his death before mine, or his not having *disposed of it* before his death," &c. then he devised the land to his friend *James Guin,* and his heirs. If it is not clear that these words do allow of a disposition by a will made before the death of *Thorold,* (as I contend it is,) it certainly is not clear on the other hand that they exclude a will.—It is then, at the worst, *doubtful,* and to remove this doubt, to assist the court in expounding the words of the devise, and giving to it its true interpretation, I contend that they have a right to look, and ought to look to the fact, that *Thorold,* was himself a trustee. No proposition can be more clear. *Vide Powell on Powers,* 55 to 57, which explains the whole doctrine, with all its distinctions.

As to the influence of the fact of trusteeship on the devise. It follows from this fact, that the great object of *Thorold* was to perpetuate the trust—to make

May 1805

Corporation, &c.
vs
Hammond

a provision of trustees for the future. He had selected *Molyneux* as the first object of his confidence—makes him the trustee in the first instance, and intends to give him power to appoint a successor. The whole scheme of the will is at once developed by this fact. *Molyneux*, a trustee. appoints a successor, who again is to appoint his successor, but in case he should omit to do so, *Molyneux* provides another himself. If this is the object, it is impossible to imagine a reason why *Molyneux* should be deprived of power to appoint by will as well as by deed. He was confessedly confided in by *Thorold*. or he would not have appointed him at all; and there can be no greater inconvenience or danger from an appointment by *will* than by deed. So far as *Thorold* can be supposed to have been influenced by example, he had the example of *Carroll* for providing a trustee by *will*, and not by deed. Yet further, he himself does the same thing by this very will. He *devises* to *Molyneux*, and over to *Guin*. This will is therefore decisive proof, that the testator could have no view to distinguish between deeds and wills, so as to exclude the last; and if he distinguished between them at all, it was only to prefer the last. He was himself a trustee under a will, and he provides for the succession by will. Upon the *intention* therefore, it would be clear, if *Thorold* was a trustee, that he could not mean to deny to *Molyneux* the power of *devising* so as to provide a future trustee. He gave him complete control over the estate, and it is ridiculous to suppose he could intend to check that control only with reference to a will. The evidence ought therefore to have been admitted, that *Thorold* was a trustee; or in other words, that the property was *trust property*. But this will be yet more evident when we examine the *second bill of exceptions*. on the construction of the will of *Thorold*; from which it will appear that this intent is not only perfectly *consistent with the words of the will*, but that it is the intent which the words do naturally and even technically indicate.

*Second bill of exceptions.* In the argument of this exception it is material to consider what estate *Moly-*

*neux* took under the devise to him. He took *a fee.* The object is admitted on all hands to have been to give to *Molyneux*, during his life, *complete control over the estate*—to dispose of it as he thought proper. This object was to be accomplished in two ways—

1. By making him *tenant for life*, with power to dispose of the fee.

2. By making him tenant in fee, and adding a defeazance in case he did not dispose.

In the first case the uses raised by the power would be served out of the devisor's estate. In the second, the act of the devisee would take effect out of the fee passed to him for the purpose of enabling him to dispose. The power of disposition would arise out of the nature of the estate devised, and be one of its qualities. The *first* of these modes was certainly not adopted *in terminis*, although undoubtedly, if it were necessary to resort to implication, the power might be and would be *implied.* 6 *Com. Dig.* 2, (A. 2.) But the *second* mode *is* adopted expressly, by a devise of the land "to *Molyneux* and *his heirs* for ever." These words necessarily pass a fee, unless plainly controled by others. But there are none others to control them. *The power of disposition, belonging to and characterizing a fee,* is impliedly recognized; but this rather confirms than controls. The *defeazance* is nothing; it may be annexed to an estate in various ways, and does not lessen it, till the event happens by which it is to be destroyed; and the purpose of it was simply to guard against accidents. The *intent* of the testator is clear that *Molyneux* should have a *fee.* It was obviously his meaning that he should have power to *dispose absolutely*; yet he gives no such power in words. He proceeds on the supposition that the power *belongs to the estate devised, i. e.* an *estate to Molyneux,* and *his heirs.* He takes the power for granted; he speaks of it as existing, and only makes ulterior provisions on the event of *Molyneux's* omitting or neglecting to use it. A devise to a woman, and to be at her disposal, "provided she disposes of it to my children"—it was held to be a fee, determi-

MAY 1805.
Corporation, &c.
vs
Hammond

nable on a disposition by her to others than the tes-tator's children. *Powell on Powers*, 55, 57. If then it is *a fee*, the right to *devise* it necessarily arises out of the estate, and the court, before they can be justi-fied in deciding such a devise void, must see clearly and affirmatively that there is in the will a negative upon that right. The testator having devised a fee, that estate will be kept in possession of all its quali-ties, and be suffered to produce all its legal effects, except so far only as a limitation is placed upon it by the will; and as a power to devise is one of its quali-ties, that power must appear to be unequivocally ta-ken away by the will giving the fee, before the court can say it did not exist in *Molyneux*. It is otherwise in the case of a mere power. There the right to de-vise must stand on the *words of the power*. It does not exist if not granted; and before the court can say it does exist, they must see clearly that it is given. In a word, when a fee is given, as here, the right to devise exists if not taken away. In a power it does not exist if not unequivocally granted. This case therefore is more favourable than a case upon a mere power, whether reserved or granted; and consequent-ly cases upon powers, which will be cited hereafter, must apply to it with peculiar force and effect. With these preliminary observations in view I will proceed to a consideration of *Thorold's* devise. It may be considered in a twofold view:

1. On the general intent.
2. On the words, or particular intent.

1. On the general intent. It has already been shown, that if the estate was held *in trust*, the testator's *ge-neral intent* was to make provision for perpetuating trustees; that *Molyneux* was the trustee whom he pre-ferred, and that *Molyneux* was to provide a successor to himself. That as he, *Thorold*, provided a trustee by will, and *Carroll* before him had done the same, he could not have meant to deprive *Molyneux* of the same power, but intended to give it. The rule is, that you are so to construe a will as best to give ef-fect to the testator's *general intent*, even though by so

doing you may defeat some *particular* intent. *Doe on Dem. Blandford, et al. vs. Applin,* 4 *T. R.* 82. *Robinson vs. Robinson,* 1 *Burr.* 38. In this case I will show that *no particular intent* is or can be defeated by supporting this general intent. But let us even suppose that the estate was *no trust*—Then the general intent is to give such a control to *Molyneux* over the fee as tenants in fee usually have, and to grant over only in case he should not execute that control. This is evident, 1st. By his devising to him *in fee*, which imports an unlimited control. 2d. By the words of defeazance, which speak of a disposition without any limitation during his life. *Molyneux* was therefore to do with the estate as he pleased; to dispose of it as he pleased. What motive could induce the testator to place the estate absolutely at *Molyneux's* disposal during his life, by deed, and exempt it from a disposition by will? If he might sell or give it away by deed on his death-bed, why not *devise* it? What rational ground of distinction? Caprice and folly might suggest a distinction, but reason could suggest none. In a word it would be inconsistent with the general intent, and therefore not to be admitted, if it can be avoided.

2. But the *words*, and the particular intent, are in correspondence with the *general intent*. The words used are, "die without having *disposed of it before his death.*" These words may be divided, and separately considered.

1. "Without having disposed of it."

2. "Before his death."

1. "Before his death," can make no change. They were introduced perhaps to guard against a *descent*. But for whatever reason introduced, as every disposition by the act of a party must be made during the life of that party, these words add nothing to the others. They imply no more than the act, whatever it was, should be during the life of *Molyneux.*

2. "Without having *disposed of it.*" It is said that devising is not *disposing* of it, within the intent of these words. I contend it is, whether the words

are considered *technically* or *vulgarly.* That a will is a *disposition of lands,* and consequently that the testator disposes of them, is too clear to be disputed. A devise is a *disposition* of a real or personal estate, to take effect after the death of the devisor. *Com. Dig.* tit. *Devise,* and *Co. Litt.* 111. a. The *formula* of every will is, "and as to such, &c. I give and *dispose thereof* as follows," &c. The statute of wills makes use of the same words "give and *dispose.*" There can be no doubt then that a will is a disposition. But the general court say it is no disposition *until death.* I say it is a disposition as soon as made, although its *effect* is postponed until death. And here is the mistake, in imagining that the words "*disposed of it,*" refer to the time of the *operation* of the disposition, and not to the time of the *making* it. By the statute of wills any person seised, &c. may give, *dispose,* &c. You are to look to the *date of the will,* and property afterwards acquired does not pass by it. In common parlance, when speaking of a man on his death-bed, would it not be correct to say, if he had made his will, that he had disposed of his property? Was it ever heard that a man should be said to have died without having disposed of his property who had left a good will of it? In speaking of the disposition, we do not mean to determine whether the disposition has *taken effect* or not, we simply mean that it has been *made.* Suppose a covenant to stand seised, or bargain and sale, to take effect at the death of covenantor or bargainor, might it not be said immediately thereafter that covenantor or bargainor had *disposed* of the property? As to its being *revocable* as a will, it is of no importance. A *lease and release,* with express power of revocation, would be a *disposition* certainly. In truth, the phrase "*disposed of,*" is the very largest and the most comprehensive phrase that can be conceived. It embraces every mode and form of alienation or settlement. But suppose the words are *capable* of being referred to the time of the *effect* of the act. They are certainly *capable of the other* in-

terpretation also, and why prefer the first? It has already been shewn, that the power to dispose by devise, stands here upon the *fee* devised, and that the court must see that this power is *taken away* by the will. But if the words are capable of two interpretations, one consistent with the power, and the other against it, it is impossible to maintain that the power is taken away. It can only be taken away by that which cannot be reconciled with it. There must be *repugnancy*, but there is no repugnancy if the words relied upon, though by one construction they *may* be set against the power, may by another construction, equally plausible, be made to stand with it.

Whether therefore the subject be considered, as it ought to be, upon the ground that the thing devised was *held in trust,* (in which case there can be no room for reasonable doubt that one interpretation of the will is sound,) or whether that ground be excluded, it is clear that *Molyneux* took a fee, and had power to devise as he has done. He also cited *Powell on Powers, 55, 57. Hob. 312. 1 Ves. 299. 2 Vern. 329.*

*Martin,* (Attorney-General,) *Key* and *Johnson,* for the Appellee, did not argue the case in the Court of Appeals.

THE COURT OF APPEALS, [*Rumsey* Ch. J. *Jones, Potts* and *Dennis,* J.] *Reversed* the judgment of the General Court upon the *second bill of exceptions,* (the other bills of exceptions having been waived,) and awarded a *Procedendo.*